1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

11

CENTRAL DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| ARNOLD NANCE,<br><br>               Plaintiff,<br><br>      vs.<br><br>TIME WARNER CABLE, INC., a corporation or other form of legal entity and DOES 1 through 100, inclusive,<br><br>              Defendants. | Case No.  CV08-07340 R (FFMx)<br><br>**FINDINGS OF UNCONTROVERTED FACTS RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Complaint Filed: September 26, 2008<br><br>Hon.       Manuel L. Real<br>Date:     October 19, 2009<br>Time:    11:00 a.m.<br>Courtroom: 8 |

13
14
15
16
17
18
19
20
21
22

/ / /

23

/ / /

24

/ / /

25

/ / /

26

/ / /

27

/ / /

28

Morgan, Lewis &
Bockius LLP
Attorneys At Law
Los Angeles

DB2/21388295.3

After consideration of the papers in support of and in opposition to Defendant Time Warner Cable, Inc.'s ("TWC" or "Defendant") Motion for Summary Judgment, the Court determines that the following facts have been established as uncontroverted:

| UNCONTROVERTED FACTS | |
|---|---|
| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
| **Nance's Job Responsibilities** | |
| 1.      In June 2003, Larry Fisher, then-President of TWC's Media Sales Division, and Brendan Gleason, Senior Vice President of Finance for TWC, hired Arnold Nance into the Media Sales Division as Director of Finance & Business in the West Regional Operations Center (ROC) located in Los Angeles. | Deposition of Arnold Nance "Nance Depo." at 49:8 to 51:19 (Referenced excerpts and exhibits of Nance's deposition are attached as Exhibit A to the Declaration of Jason S. Mills ("Mills Decl."), filed concurrently). |
| 2.      The West ROC provided "back office" support for TWC's Media Sales Division—which sells ad time on the cable network. | Declaration of Barry Feldstein "Feldstein Decl." ¶ 8 (filed concurrently) |
| 3.      Nance was the senior accountant responsible for handling all financial matters for the West ROC. | Nance Depo. at 58:4-13. |
| 4.      Part of Nance's job was to prepare quarterly management representation letters | Nance Depo. at 102:25 to 104:9. |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                                    2

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| for the West ROC. | |
| 5.      Rep letters are prepared to assist outside auditors and certify management's belief that the company's financial statements fairly present the company's financial condition and results. | Feldstein Decl. ¶ 14. |
| 6.      Rep letter "exceptions" note, for example, internal control issues and financial information that the signatories cannot certify. | Feldstein Decl. ¶ 14. |
| 7.      As part of Nance's job, he was "obligated" to report exceptions in the rep letter. | Nance Depo. at 112:11-19. |
| 8.      Then-Vice President of Technical Accounting, Bill Osbourn, encouraged the finance and accounting personnel to raise anything in an exception that they had a question about. | Deposition of William Osbourn ("Osbourn Depo")  at 96:24-97:16 (Referenced excerpts of Osbourn Depo. are attached to Mills Decl. as Exh. G). |
| 9.      The West ROC's rep letter covered a small fraction of TWC's entire business. For example, in fiscal year 2007, revenue for the Media Sales Division nationwide was about $236 million compared to revenue for the whole company, which was about $16 billion. | Feldstein Decl. ¶ 16. |
| 10.      Nance's job also included | Nance Depo. at 79:12 to 80:14; |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| communicating with "Adlink." | 83:13-25. |
| 11.     Adlink is an "Interconnect," which is a partnership among cable companies to facilitate sales of advertising spots in a particular region. | Feldstein Decl. ¶¶ 3-4. |
| 12.     Through an Interconnect, advertisers can enter a single contract to purchase ad spots that run on all competing cable networks in a region at the same time, thus ensuring maximum viewership. | Feldstein Decl. ¶ 3. |
| 13.     Before a series of mergers occurred in mid-2006, Adlink was comprised of five primary partners: TWC, Comcast, Adelphia, Charter, and Cox Communications. | Nance Depo. at 73: 17-24; 76:4-21 |
| 14.     Each of the five primary partners in Adlink contributed inventory to Adlink in the form of 30-second ad slots. | Nance Depo. at 73: 17-24; 76:4-21 |
| 15.     Adlink, in turn, sold the spots to businesses.  The cost of ad slots was based on ratings points, which were determined by The Nielsen Company. | Nance Depo. at 73: 17-24; 76:4-21 |
| 16.     Adlink then distributed revenue to the partners based on the number of cable subscribers ("subscriber counts" or "sub counts") that each partner reported to Adlink in quarterly reports. | Nance Depo. at 73: 17-24; 76:4-21 |
| 17.     The term "subscriber" was defined by | Feldstein Decl. ¶¶ 6-7, 63, Exh. 2. |

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| contract with Adlink.   The definition of a subscriber under the Adlink contract in the 2004-06 time-period included gratis accounts or "frees," which are non-paying, authorized viewers (typically VIPs and company employees). | |
| 18.     Nance did not know whether the sub count calculation was based on a definition set forth in a contract with Adlink.  Rather, Nance believed that there was a "common definition" of sub count, which is "generally a paid subscriber, someone who pays for your service." | Nance Depo. at 125:9-11; 126:5-7. |

**TWC's Dramatic Structural Changes From 2006 To 2008**

| | |
|---|---|
| 19.     In March 2006, Larry Fischer informed Nance that he was being promoted to Senior Director of Finance at the West ROC. | Nance Depo. at 86:21-25; 88:5-11. |
| 20.     Shortly after Fischer informed Nance of his promotion, Fischer's and Gleason's employment ended and they were replaced by Joan Gillman and Barry Feldstein, respectively. | Feldstein Decl. ¶ 11. |
| 21.     Effective July 16, 2006, Feldstein was hired as a corporate Vice President of Finance at TWC's headquarters in New York overseeing all Media Sales. | Feldstein Decl. ¶ 8. Barry Feldstein Deposition ("Feldstein Depo.") at 96:16-19; 121:5-14 (Referenced excerpts are |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                                   5

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| | attached to Mills Decl. as Exhibit B) |
| 22.     Gillman, who also officed in New York, became the President of Media Sales | Joan Gillman Deposition ("Gillman Depo.") at 20:17-20 (Referenced excerpts are attached to Mills Decl. as Exhibit C) |
| 23.     Feldstein had been hired from Comcast, where he had held the title of Vice President of Business Operations and had gained extensive experience in cable industry mergers and Interconnects (including Adlink). | Feldstein Decl. ¶¶ 9-10. Feldstein Depo. 18:2-19:18. |
| 24.     As of July 2006, Nance began reporting to Feldstein. | Nance Depo. at 142:18-21. |
| 25.     In this same time-frame, TWC also hired Comcast's former Director of Operations, Shabnam Dewji. | Shabnam Dewji Deposition ("Dewji Depo.") at 10:5-12; 16:17 to 17:1 (Referenced excerpts are attached to Mills Decl. as Exhibit D) |
| 26.     At Comcast, Dewji had been responsible for calculating Comcast's sub counts and submitting them to Adlink. | Dewji Depo.10:5 to 11:12; 18:18-21; 29:3-6. Feldstein Depo. 36: 1-5. |
| 27.     Effective August 1, 2006, TWC merged with the Los Angeles operations of Comcast and Adelphia, which increased TWC's market share from 17% to 73%. | Nance Depo. at 88:5-11; 90:15-24; 90:6 to 91:2. |
| 28.     In February 2008, TWC entered a | Feldstein Decl. ¶ 19. |

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| contract with Charter to manage its advertising inventory and employees in Los Angeles. | |
| 29.    TWC became the managing partner of Adlink through a new partnership agreement that became effective in February 2008.  TWC then became responsible for Adlink's financial reporting. | Feldstein Decl. ¶ 20. Nance Depo. at 91:3-13; 95:23 to 96:12; 97:15 to 98:23. |
| 30.    As a result of these dramatic structural changes, by early 2008, about 540 employees from four different cable and Adlink now were all part of TWC's Media Sales Division. | Feldstein Decl. ¶ 21. |
| 31.    Feldstein was responsible for creating a plan to extract savings from the consolidation by eliminating redundancies in the West ROC, including a reduction in force that eliminated about 90 jobs. | Feldstein Decl. ¶ 31. Gillman Depo. at 96:3-12 |
| **Nance's Anger Management Problem** | |
| 32.    In September 2006, after several complaints had been made about Nance's behavior, Human Resources recommended to Feldstein that he counsel Nance. | Feldstein Decl. ¶¶ 23, 62, Exh. 1. Nance Depo. at 261:12 to 265:9. |
| 33.    Feldstein did so and, at the | Feldstein Decl. ¶¶ 23, 62 Exh. 1. |

| | |
|---|---|
| suggestion of Human Resources, recommended that Nance attend an anger management training course. | Nance Depo. at 261:12 to 265:9. |
| 34.     The counseling resulted from a formal complaint about Nance's behavior that Christal Morris brought to the attention of Feldstein and Kristin Payne, then-Senior Director of Human Resources for Media Sales.  Morris was a new Human Resources Manager located in the Cypress, California office where Nance's office was located. Morris described complaints indicating that Nance was difficult to deal with and combative. | Kristin Payne Deposition ("Payne Depo.") at 37:4 to 38:3 (referenced excerpts are attached as Exhibit F); Feldstein Depo. at 140:25 to 142:1 |
| 35.     The employees that complained to Morris were sales people as well as Shabnam Dewji, Director of Operations. | Payne Depo. at 96:8-97:13. |
| 36.     A number of employees also reported Nance's behavioral problems directly to Payne, including Tim Young, Dave Bultman, Blaine Rominger, and Chris Faw, Vice President of Operations. | Payne Depo. at 48:24-49:15; 56:24-57:19; 58:19-60:8. |
| 37.     Payne noticed a pattern to the issues raised about Nance, including his "behavior, his temper, his demeanor, his | Payne Depo. at 58:19-60:8 |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                                    8

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| mood swings, his being combative." | |
| 38.     Payne also personally observed an instance where Nance was verbally abusive to the Vice President of Strategic Planning, Larry Zipin. The incident occurred before the close of Adelphia/Comcast merger in the summer of 2006.  Nance became very argumentative and the whole table stopped talking and stared.  Nance was asking Larry Zipin questions "and it became very hostile, very argumentative, and he was sort of attacking Larry Zipin."  Larry Zipin did not display any hostility. | Payne Depo. at 60:17 to 61:3; 100:23 to 103:4; *Id.* at 111:12-20 (dinner was some time in summer of 2006) |
| 39.     Larry Fischer was informed about the incident.  Payne asked him to have a conversation with Nance about his behavior, and she believes that the conversation occurred. | Payne Depo 108:7-109:21 |
| 40.     Larry Zippen spoke to Angelo Servedio, Director of Finance at TWC corporate in New York, about the dinner in Los Angeles and said that Nance had been verbally abusive to him. | Angelo Servedio Deposition ("Servedio Depo.") at 45:5-46:4 (Referenced excerpts attached as Exhibit E to the Mills Decl.) |
| 41.     Servedio heard similar comments about Nance's behavior from other | Servedio Depo at 47:19-48:17 |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                                              9

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| employees, including Dave Martinez, Dominic Lattore and Vias Carusis, who reported to Nance.  They said Nance was "yelling at people and getting in their face and that sort of thing."  They reported that this behavior was not an isolated incident. | |
| 42.     Servedio heard similar comments about Nance's behavior from Brendon Gleason as well as other Directors of Finance, including Gerry-Lynn Bressler, Ria Carter, and Ken Welch. | Servedio Depo 82:24-85:7 |
| 43.     In addition, Brendon Gleason informed Servedio that Nance was terminated from the job he held before coming to TWC (where Nance had worked with Gleason and Servedio) because Nance was verbally abusive to people. | Servedio Depo at 92:3-13 |
| 44.     Servedio testified that Nance had a reputation for being a hot head and he formulated this opinion not long after he became employed at TWC. | Servedio Depo. at 43:4-23; 82:10-23 (Nance was a good accountant but "had a reputation of being somewhat of a hothead"); ("Arnie had a reputation as a hothead") |
| 45.     Because Servedio heard similar comments about Nance's behavior from so many sources, he concluded that it | Servedio Depo. at 88:4-25; 89:22-90:3 |

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| was true. | |
| 46.    Employees also discussed Nance's behavioral problems directly with Feldstein.  For example, Tim Young, Vice President of Sales, informed Feldstein that Nance "had threatened him" and "was difficult to work with," and suggested that Feldstein terminate Nance.  In describing the threat, Young said that Nance leaned over and said, "I'll bury you." | Feldstein Depo. at 145:17-147:17 |
| 47.    Joan Gillman participated in a conversation with Feldstein and Young in October 2006 in which Young complained about Nance.  Young said that Nance was creating a hostile work environment and he wanted Feldstein to deal with it.  Young described Nance's anger, his use of swear words and generally aggressive conduct in dealing with others in the organization. | Gillman Depo. at 38-40; 48:7-16 |
| 48.    Feldstein and Payne informed Gillman that there had been complaints about Nance's behavior and that they were addressing the problem with Nance. | Gillman Depo. at 49:2-18 |
| 49.    Director of Sales Blane Rominger | Feldstein Depo. at 142:6-12 |

| | |
|---|---|
| made a complaint to Feldstein about Nance's behavior. | |
| 50.    Shabnam Dewji complained to Feldstein about Nance's behavior. Nance treated her inappropriately in a meeting, which other witnesses also reported to Feldstein, including Vias Karouzas. | Feldstein Depo. at 148:23-149:20 |
| 51.    Chris Faw complained to Feldstein about Nance because managers in Los Angeles that reported to Faw complained to Faw about Nance's behavior.  Faw said that he couldn't keep a manager in California because Nance would just run them out. | Feldstein Depo. at 152:17-153:2 |
| 52.    Feldstein understood that the mergers that were occurring in the West in the 2008-07 time-frame involved a difficult process, but Feldstein has gone through such transactions himself and viewed it as no excuse for bad behavior with front line employees, which is "never acceptable." | Feldstein Depo. at 144:1-8. |
| 53.    Feldstein disagreed with the culture that Nance had created in the West.  Feldstein believed that there needed to be more openness and more | Feldstein Depo. at 153:18-23. |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                                   12

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| hand holding with the sales people. | |
| **Nance Notifies Feldstein That Comcast Calculated Sub Counts Differently In Its Reports to Adlink Prior to Comcast's Merger with TWC** | |
| 54.   In October 2006, after the Adelphia and Comcast cable systems in Los Angeles merged with TWC, Nance's finance team became responsible for reporting subscriber counts to Adlink. | Nance Depo. at 90:25 to 91:13. |
| 55.   Using the methodology that TWC historically had used, Nance's group calculated the sub counts for the legacy Comcast system and submitted them to Adlink. | Nance Depo. at 128:15 to 129:10. |
| 56.   After doing so, they noticed a drop in sub counts compared to the quarter just before the merger when Comcast had reported its own sub counts. | Nance Depo. at 121:23 to 122:18. |
| 57.   Nance does not know what definition of "subscriber" Comcast used when it calculated its sub counts for its submissions to Adlink and testified, "It wasn't my responsibility to know that." | Nance Depo. at 125:1-6; 126:11 to 127:25 (has no idea prior to the merger how Comcast calculated its sub counts) |
| 58.   Nance began to investigate the drop and learned that Dewji had been responsible for submitting Comcast's | Nance Depo. at 129:6-18. Dewji Depo. 58:10 to 60:10. Feldstein Decl. ¶ 78, Exh. 17. |

| | |
|---|---|
| sub counts to Adlink. | |
| 59.    During Feldstein's employment at Comcast, he had no involvement in calculating sub counts for Adlink. | Feldstein Depo. at 35:17 to 36:5; 41:7-42:1. Feldstein Decl. ¶ 27. Dewji Depo. at 10:5 to 11:2; 18:18-21; 29:3-6 |
| 60.    In October 2006, Nance asked Dewji how Comcast had calculated sub counts.  Dewji described her methodology and said that she was including an estimate of "frees" or non-paying customers.  On October 17, 2006, emailed Nance a spreadsheet that unmistakably reflected her methodology. Nance believes that Dewji understood that there was a difference between the way that TWC and Comcast calculated sub counts, but does not know whether Dewji thought her calculation at Comcast was incorrect and he has no idea how Comcast did the calculation or what they were thinking when they performed the calculation. | Dewji Depo. at 58:10 to 63:14. Feldstein Decl. ¶ 78, Exh. 17. Nance Depo. at 123:5-8; 130:6-21; 133:1-7. |
| 61.    The information that Dewji provided showed that, while she was at Comcast, her sub count reports included certain non-paying viewers, including | Dewji Depo. at 11:22 to 12:10. Nance Depo. at 126:8-10. |

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| "gratis" accounts or "frees" (viewers who received free service), bulk (which estimated viewership in multiple dwelling units), and "theft" (unauthorized viewers). | |
| 62.    Based on Dewji's 20 years of experience in the cable industry, she understood her calculation to provide a reasonable estimate of real "eyeballs" that viewed ads. | Dewji Depo. at 9:24 to 12:10; |
| 63.    TWC's sub count reports to Adlink (which were calculated under Nance's supervision) included only *paid* subscribers and excluded, for example, "frees." | Feldstein Decl. ¶ 7<br>Nance Depo. at 126:8-10 |
| 64.    On November 28, 2006, Nance had an analysis prepared that opined that Comcast had inflated its sub counts by 15-17% in 2005 and 2006 (pre-merger) and that, as a result, Adlink had overpaid Comcast a total of $3.9 million. | Nance Depo. at 121:23 to 122:3; 130:17 to 131:5; 329: 10-17, Feldstein Decl. ¶ 65, Exh. 4 (AN44-45) |
| 65.    TWC had about a 15% stake in Adlink at the time. | Feldstein Decl. ¶ 26.<br>Dewji Depo. at 39:21-40:3. |
| 66.    If it were true that Adlink had overpaid Comcast by a total of $3.9 million for the two-year period of 2005 and 2006, TWC would not have been | Feldstein Decl. ¶ 26.<br>Dewji Depo. at 39:21-40:3. |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                                    15

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| owed the entire $3.9 million, but only its 15% share of that sum (or about $585,000). | |
| 67.    In early 2008, Feldstein prepared a chart analyzing the materiality of the Comcast sub count issue, which calculated TWC's annual share of the total estimated over-payment to be only $345,000. | Feldstein Decl. ¶ 42, 72, Exh. 11 (TWC-NANCE 000956) |
| 68.    Either in the fourth quarter of 2006 or at a meeting in April 2007, Nance first informed Feldstein that "he calculated the subscribers, and there was a potential difference" in the manner that Comcast had calculated its sub counts in its submissions to Adlink. | Feldstein Depo. at 9:12-21 Nance Depo. at 138:8-25 (told Feldstein, Tim Young, Adlink people and Chris Faw that "there was a significant difference in sub counts") |
| 69.    At a meeting in October 2006 or January 2007, Nance informed Joan Gillman that he believed that Comcast had calculated sub counts in a manner that was different than TWC in its reports to Adlink. | Nance Depo. at 138:8 to 139:9; 143:17-23; 151:3-14 ("Q. So you believe in January 2007 you raised it at the Adlink board meeting? A. To Joan Gilman, the chair of Adlink's board, yes."); id. at 152:14-25 (Nance informed Joan that "there was – we were pretty certain there was a drop – significant drop in sub counts and that there was an overstatement and errors |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                          16

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| | committed in the prior years")<br><br>Gillman Depo. at 62:15 to 69:1-7 |
| 70.     Gillman recalls that, during that conversation, Nance and Feldstein discussed the possible reasons for the discrepancy, including Feldstein's inquiry as to whether Comcast had sub count calculation was based on a "kitchen count." | Gillman Depo. at 63:2 to 64:9. |
| 71.     Nance also mentioned the Comcast sub count issue to Feldstein in April 2007.  Nance does not recall any subsequent communications on the topic prior to January 2008. | Nance Depo. at 149:1-10;153:18-20; 153:25 to 154:9; 159: 16-21. |
| 72.     In Nance's view, Gillman and Feldstein were "silent on the subject" of sub counts, meaning that they never "follow[ed] up." | Nance Depo. at 148:21 to 149:2. |
| 73.     In Gillman's view, the Comcast sub count issue was miniscule compared to the multi-billion dollar issues that TWC was negotiating with Comcast. | Gillman Depo. at 117:2-118:2 ("So if I could for a minute put things in context, $2 billion negotiation and a few million dollar exception, no one identified it as an issue.") |
| 74.     No one ever told Nance to be quiet about the Comcast sub count issue | Nance Depo. at 164:18-25; 173:8-11. |

MORGAN, LEWIS &<br>BOCKIUS LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| or not to follow up on it. | |
| 75.    As Senior Director of Finance in the West, it was Nance's job to handle the sub count issue — not anyone else's. | Nance Depo. at 165:10 to 166:3. |

**Gilman Asks Feldstein To Transfer To The West ROC In Los Angeles, Which Makes Nance's Job Redundant**

| | |
|---|---|
| 76.    In October 2007, Joan Gillman asked Feldstein to transfer to Los Angeles to be the Vice President of Finance for the Media Sales Division over the West ROC. | Gillman Depo. at 94:10 to 97:16; 103:24 to 104:5. |
| 77.    Although, on paper, the change from Vice President of Finance at the corporate office to Vice President of Finance of Medial Sales over the West ROC was a demotion, Gillman believed the job would be a better fit for Feldstein and would add value for the company. | Gillman Depo. at 104:14 to 105:19; 94:23 to 96:12. |
| 78.    Feldstein had many years of experience in the cable industry, including in Los Angeles and with Adlink. | Feldstein Decl. ¶ 10. |
| 79.    Because of the size and complexity of the restructuring in Los Angeles, Gilman (in consultation with Artie Minson, Deputy CFO) determined that the West Region needed someone | Gillman Depo. at 95:10-25 - 96:3-12. |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3

18

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| with Feldstein's experience to provide leadership | |
| 80.     The change was not announced immediately, however, because a replacement for Feldstein's corporate Vice President job in New York had not yet been found. | Feldstein Decl. ¶ 30. Gillman Depo. at 138:22 to 139:3 |
| 81.     On December 17, 2007, Feldstein attended a meeting in Los Angeles. While having lunch with Nance, Feldstein told Nance that he would be transferring to Los Angeles to take the role of Vice President of Finance over the West ROC. | Nance Depo. at 215:17 to 217:1. Feldstein Decl. ¶ 32. |
| 82.     The role was senior to Nance's job but had similar responsibilities. | Nance Depo. at 215:17 to 216:17. Feldstein Decl. ¶ 32. |
| 83.     Nance expressed concern that his position was being eliminated.  Feldstein said he would try to work something out. | Feldstein Depo. at 129:12 to 130:13. Nance Depo. at 222:5 to 223:3. |
| 84.     Feldstein considered the possibility of placing Nance in "controller-type" role, which would be a demotion for Nance. | Feldstein Depo. at 129:12 to 130:13. |
| 85.     On December 17, 2008, shortly after Feldstein's lunch conversation with Nance, Gillman emailed the Media Sales Division announcing Feldstein's transfer | Nance Depo. at 215:21 to 217:1, 300:8-301:6; Feldstein Decl. ¶ 64, Exh. 3. (AN150, 157) |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                                    19

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| to Los Angeles. | |
| 86.    Nance was "devastated" and "humiliated" by the news because he felt he was losing his job to Feldstein. | Nance Depo. at 216:11-17; 220:3-15. |
| 87.    On December 18, 2007, Nance emailed Vice President of Human Resources Kristin Payne, saying he was "shocked," "very nervous and unsure" about the ramifications of Feldstein's transfer, and "very upset and extremely anxious." | Nance Depo at 300:8-301:6, Feldstein Decl. ¶ 64, Exh. 3. (AN150, 157) |
| 88.    On December 19, 2007, Nance spoke with Payne by telephone.  Nance was very upset and expressed concern about his job status.  Nance also conveyed his job demands—including a Vice President title and a three-year contract, which he said he deserved and had been promised by his prior bosses. | Nance Depo. at 217:5 to 218:20. Payne Depo. at 131:5-21; *id.* at 125:14-24 (Nance said "Larry Fisher promised him a VP position" and he "was pretty adamant that he wanted to be a VP and put on contract, employment contract"); *id.* at 131:11-21 ("I remember him…demanding a VP title"); *id* at 132:16-25 ("[H]e seemed pretty adamant that if he was to continue with the company, he really wanted to be in a vice president role."); id. at 133:2-9  ("[H]e felt that he deserved to be a VP."). |
| 89.    On or around December 22, 2007, Nance asked one of his direct reports, | Nance Depo. at 328:22-329:17; Feldstein Decl. ¶ 65, Exh. 4. (AN44- |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                                      20

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| David Martinez, to locate an email that Nance believed he previously sent to Feldstein attaching the estimate of the Comcast sub count issue that had been prepared in November 2006.  Finding the prior email was apparently so important to Nance, that Martinez contacted Josh Hemus to inquire about it, even though Hemus no longer was employed by TWC. | 45) |
| 90.     Payne told Feldstein about the communications she had had with Nance, including his job demands. | Payne Depo. at 131:5-135:4. |
| 91.     Shortly after Payne's conversation with Nance, Feldstein made the decision to eliminate Nance's position in the West ROC. | Feldstein Depo. 126:3-127:23 |
| 92.     Feldstein had three reasons for his decision to eliminate Nance's position: (1) Feldstein was responsible for eliminating redundancies in the West ROC after the multiple mergers in 2006-08.  Due to Feldstein's impending move to Los Angeles, Nance's highly-paid senior finance position was redundant and could not be justified. (2)  The tone and substance of Nance's conversation | Feldstein Decl. ¶ 35. Feldstein Depo. at 127:6-17 |

| | |
|---|---|
| with Payne reflected that Nance would not be able to work effectively in a demoted role reporting to Feldstein. (3) Feldstein was concerned that Nance's hot-headed management style would undermine the team culture that he hoped to cultivate in the West. | |
| 93.    Although Feldstein came to this conclusion in mid to late December 2007 shortly after speaking to Payne, he did not inform Nance immediately because Feldstein had not yet physically transferred to Los Angeles.  Feldstein still spent a substantial amount of time in New York until February, helping to orient his replacement, Sean Murtagh. | Feldstein Depo. 126:3-127:23; *see also id*. at 174:22-25 (decided to let Nance go in "mid to end of December") <br><br> Feldstein Decl. ¶ 55. |
| **The Rep Letter Of January 8, 2008** | |
| 94.    The quarterly rep letters for which Nance was responsible were largely based on a template that could be tailored to address any specific issues arising in the covered quarter. | Feldstein Decl. ¶ 15. |
| 95.    On January 8, 2008, Nance received a standard email that attached the template rep letter.  The email asked him to execute the rep letter for the fourth quarter of 2007, to make | Nance Depo. at 294:9 to 295:13, Feldstein Decl. ¶ 67, Exh. 6. |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                                    22

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| Feldstein or Gillman aware of any exceptions, and to sign and submit the letter to Angelo Servedio, a Director of Finance at TWC's corporate office who was responsible for aggregating all of the regional letters. | |
| 96.     On January 8, 2008, Nance emailed Feldstein (with a copy to Gillman and another signatory to the rep letter, Lisa Meier) proposing six exceptions that he proposed to include in the rep letter. | Nance Depo. at 294:9 to 296:12, Feldstein Decl. ¶ 67, Exh. 6. |
| 97.     In an email dated January 9, 2008, Feldstein responded to Nance's proposed exceptions as follows: <br><br> "1) The Marketing trade issue is a Cable Division issue and we have flagged it to Corp finance and TWC audit. <br><br> 2) I agree with your language just add the Corp approval. <br><br> 3) Spoke with Chris Benigo [Director of Finance at Adlink] about the sub issue, and Adlink receives certified sub statemetns from an officer of each MSO | Nance Depo. at 294:9 to 296:12 Feldstein Decl. ¶ 67, Exh. 6. |

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

| | |
|---|---|
| [cable company] on a periodic basis per the partnership agreement.  She is going to send me the definition of subs, but remember Adlink uses kitchen count which includes MDU's [Multi Dwelling Units] (broken out) and free accounts, etc.  Given the history we should look at the subs but hold as a Rep letter exception until we understand the differences, but I will default to you.<br><br>        4) & 6) The deferred revenue issue we can rep from up here at Corp, given our involvement with Corp Accounting and Adlink.<br><br>        5) Per our conversation, I think its only a control issue and I would have Shabnam [Dewji] weigh in." | |
| 98.     On January 9, 2008, Nance responded via email explaining why he believed that exceptions nos. 1 and 5 needed to be communicated in the rep letter. | Feldstein Decl. ¶ 67, Exh. 6. |

| | |
|---|---|
| 99.    On January 10, 2008, Feldstein responded to Nance saying, "That's fine." | Feldstein Decl. ¶ 66, Exh. 5. |
| 100.   Feldstein was not upset that Nance wanted to include exceptions in the rep letter.  Many regional rep letters include exceptions and he just viewed it as Nance doing his job. | Feldstein Depo at 108:22-109:1 |
| 101.   Other than Feldstein's concern that exceptions include accurate information, Feldstein had no problem whatsoever with Nance including the exception about the Comcast sub count issue. | Feldstein Depo. at 113:5-16 |
| 102.   Feldstein spoke with Angelo Servedio about Nance's email listing the exceptions that he planned to include. Servedio's view of Feldstein's reaction was that "He wanted to get the issue straightened out.  He wanted to go through each of the items and see whether or not they belong there." Servedio described Feldstein's attitude as "fine.  It's not unusual for the directors of finance at the regional level to put exceptions in there, to send exceptions to us at the corporate group | Servedio Depo. at 20:24 to 21:21; 72:13-73:17. |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                                25

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| and get our opinion on whether or not they should be included  So I think he felt as though it was the normal course of business."  Feldstein never expressed a concern that the exceptions might reflect negatively on his performance. From Angelo's perception, Barry did not appear to be "the least bit annoyed or perturbed by any of the items that Mr. Nance put in his…email." | |
| 103.   In the final rep letter, Nance included all of the proposed exceptions. | Nance Depo. at 274:10-21 Feldstein Decl. ¶ 68, Exh. 7 |
| 104.   Nance emailed the rep letter directly to David DeGroff, TWC's Manager of Internal Control Compliance (ICC), not to Servedio.  This was inconsistent with past practice, in which Nance always had forwarded the rep letters to Servedio so that he could accumulate the regional rep letters and pass them on to ICC. | Nance Depo. at 321:23 to 322:8, Feldstein Decl. ¶ 69, Exh. 8 (AN35) Servedio Depo. at 26:9-27:15. |
| 105.   On January 8, 2008, Nance forwarded his email exchange with Feldstein about Nance's proposed exceptions to his personal email account. | Nance Depo. at 321:23 to 322:8; Nance Dep. Exh. 17, Mills Decl. Exh. A (AN26) |
| **Nance Denies Knowledge Of Any Fraud** | |
| 106.   Paragraph 7 of the rep letter of | Nance Depo. at 274:10-21 |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3     26

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| January 8, 2008 reads as follows: "We have **no knowledge of any fraud or suspected fraud**, whether or not material, involving management or other employees who have a significant role in the ROC's internal control over financial reporting.  In addition, we have **no knowledge of any fraud or suspected fraud** involving other employees where fraud could have a material effect on the accounting records."  (emphasis added) | Feldstein Decl. ¶ 68, Exh. 7 |
| 107.   Nance did not list any exceptions to paragraph 7. | Nance Depo. at 274:10-21<br>Feldstein Decl. ¶ 68, Exh. 7 |
| **Exception 22.vii: Comcast's Alleged Inflation Of Subscriber Counts** | |
| 108.   Exception 22.vii reads as follows: "Pursuant to paragraph 1.g, we are disclosing with respect to Adlink, we have previously reported to both Adlink and corporate management that there was a material error in sub counts over several years as submitted by the former Comcast system that have never been retroactively corrected or accounted for by the Adlink partnership resulting in the loss of potential revenue to both TWC and the other partners in the partnership." | Nance Depo. at 274:10-21<br>Feldstein Decl. ¶ 68, Exh. 7 |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

| | |
|---|---|
| 109.   The referenced "paragraph 1.g" of the rep letter is a representation that "[a]ll transactions that are material, individually or in the aggregate, have been properly recorded in the accounting records." | Nance Depo. at 274:10-21<br><br>Feldstein Decl. ¶ 68, Exh. 7 |
| 110.   On January 14-15, 2008, in an email exchange unrelated to the rep letter, Nance, Feldstein, and others discussed how Comcast and TWC calculated sub counts for Adlink. | Feldstein Decl. ¶ 71, Exh. 10 |
| 111.   In an email dated January 14, 2008, Feldstein asked Nance, "what do you think is driving the difference" between Comcast's and TWC's sub count calculations. | Feldstein Decl. ¶ 71, Exh. 10 |
| 112.   On January 15, 2008, Nance responded to Feldstein's question, saying, "Not sure who certified the subs for Comcast back then but it appears that a multiplier was added to the sub counts in the range of 15-17%...."   In response, Feldstein asked, "You mean there is a multiplier above the Kitchen count? Could part of it be free accounts?" | Feldstein Decl. ¶ 71, Exh. 10<br><br>[*Note: "Kitchen count" is an industry term used by Feldstein to include counts of actual "kitchens" or eyeballs, and not only paid subscribers*. Feldstein Depo. 31:23-25] |
| 113.   On January 15, 2008, Nance responded to Feldstein's email, saying: | Feldstein Decl. ¶ 71, Exh. 10 |

MORGAN, LEWIS &<br>BOCKIUS LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES

28

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| "Not sure, what I am sure about is that when TWC began counting the subs acquired from Comcast and applied TWC's methodology they came back with a difference and when we investigated it we found that a 15-17% multiplier was applied by Comcast before they submitted to Adlink.  I think Shabnam would be your best source for the how and why part of your question…." | |
| 114.   On January 14, 2008, David DeGroff in ICC emailed Nance to inquire about the materiality of the exceptions that Nance included in the rep letter of January 8, 2008. | Feldstein Decl. ¶ 70, Exh. 9 (AN28/TWC-NANCE 001592) Nance Depo. at 326:2 to 327:9 |
| 115.   For the Comcast sub count issue, DeGroff asked if the financial impact would be more or less than $5 million. As noted above, in Nance's November 2006 calculation, he had estimated that Adlink had overpaid Comcast a total of $3.9 million in 2004 and 2005.  In his response to DeGroff, Nance said that "for the last two years of overstatement it's approximately $4 million so for the life of the overstatement this could be in | Feldstein Decl. ¶ 70, Exh. 9 (AN28/TWC-NANCE 001592) |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| excess of $10 million." | |
| 116.   Nance's email did not inform DeGroff that Nance had calculated this $4 million over-payment estimate in November 2006 nor explain why Nance did not raise the issue in any of the prior five regional quarterly rep letters. | Feldstein Decl. ¶ 70, Exh. 9 (AN28/TWC-NANCE 001592) |
| 117.   As with all exceptions, Bill Osbourn, then Vice President of Technical Accounting for TWC corporate, reviewed the exceptions reported by Nance. | Osbourn Depo. at 28:11 to 32:1. |
| 118.   Bill Osbourn was hired as TWC's Vice President of Technical Accounting in 2003.  Prior to that, Osbourn served for two years as Executive Director of External Financial Reporting and Accounting Policy at Time Warner Inc. Before that, he was at partner at PricewaterhouseCoopers, where he had been employed for fourteen years.  He is a Certified Public Accountant. Effective February 1, 2008, he was promoted to Senior Vice President and Controller and Chief Accounting Officer.  Osbourn reviewed the information relating to the Comcast sub count issue and determined | Feldstein Decl. ¶ 41; Osbourn Depo. at 28:11 to 32:1; *see also id.* at 59:21-60:24 (whether it was $4 million or $10 million, it was not material, and they needed to focus their attention on significant issues); *id.* at 84:18-21 (even if the sub count issue was valued at $20 million, it still would not have been material for disclosure purposes). |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                                    30

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| that $4 - $10 million was not material to the accuracy of TWC's financial statements—even if the entire amount was for a single year as opposed to over a period of years.  He  reported his conclusion to TWC's outside auditor. | |
| 119.   Materiality for purposes of impact on TWC's financial statements depends on the facts and circumstances of the issue.  If an issue has a potential financial impact of $5 million it is reported to the outside auditor for it to track—but that amount still is not material to TWC.  An issue valued at $5 million is not material because of the amount of TWC's operating income.  A $5 million issue would not affect a shareholder or potential shareholder's decision whether to invest in TWC or not, given TWC's size.  The potential amount in issue would have to significantly exceed the amounts raised in Nance's exceptions to approach materiality. | Osbourn Depo. 43:7-44:1 |
| 120.   From an accounting perspective, Osbourn determined that nothing else needed to be done with the Comcast sub | Osbourn Depo. at 135:20-137:11 |

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| count issue.  The outside auditor agreed. | |
| 121.   Osbourn never heard anyone suggest that Nance thought the subscriber count issue involved any type of fraud. | Osbourn Depo. at 155:9-16. |
| 122.   In Feldstein's discussions with Osbourn about the exception concerning the Comcast sub count issue, his demeanor "was normal.  Barry is a very talkative individual.  And he was his normal, talkative self."  Feldstein did not indicate that he disagreed with Nance or that this could prove to be embarrassing to him.  He expressed no concern to Osbourn that an overstatement of sub counts by Comcast would reflect negatively on him as a manger. | Osbourn Depo. at 92:23 to 94:3. |
| 123.   Servedio also said that Feldstein did not seem concerned about the exception relating to the sub count issue. | Servedio Depo. at 41:13-17. |
| **Exceptions 22.ix & x: Treatment Of Adlink's Deferred Revenue Reserve** | |
| 124.   Exception 22.ix reads as follows: "We are deferring to the NY corporate office the recognition of the Adlink deferred revenue that relates to the pre Comcast Adelphia merger time frame. We do not have sufficient evidence or | Feldstein Decl. ¶ 68, Exh. 7. |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                    32

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| knowledge in house to determine if this is a goodwill adjustment or a revenue recognition event." | |
| 125.   In response to DeGroff's email of January 14, 2008 inquiring about the materiality of exception ix, Nance informed DeGroff that the West ROC had been asked to recognize approximately $2.1 million in revenue. | Feldstein Decl. ¶ 70, Exh. 9 (AN28/TWC-NANCE 001592) |
| 126.   Exception 22.x reads as follows: "We cannot represent that the 2007 true up of working capital accounts with Comcast properly reflected their share of Adlink's deferred revenue liability at the time of the acquisition and are deferring such rep to the NY corporate office." | Feldstein Decl. ¶ 68, Exh. 7 |
| 127.   A "true up" occurs at the last stage of a merger when final issues are resolved and the deal is closed. | Feldstein Decl. ¶ 46. |
| 128.   The issues in exceptions 22.ix and x stem from a deferred revenue reserve on Adlink's books arising in the early 2000 time frame and the treatment of that reserve during the Adelphia/Comcast merger with TWC. Exception 22.ix relates to Adelphia. Exception 22.x relates to Comcast. | Feldstein Decl. ¶ 43. |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                                                33

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| 129. Adlink sold advertising based on Nielsen ratings points. If the promised ratings points were not delivered, Adlink could potentially be responsible for compensating advertisers for the under-delivery of ratings in the form of free ad spots called "make goods." | Feldstein Decl. ¶ 44. |
| 130. In early 2000, an Adlink account executive misrepresented ratings points to advertisers. | Feldstein Decl. ¶ 44 Nance Depo. at 188:24-25 to 189:1-17 |
| 131. Due to these two issues related to the under-delivery of ratings points, Adlink's outside auditor required it to create a deferred revenue reserve. The reserve represented the value of the under-delivery of ratings points and the amount for which Adlink could be liable if the advertisers sought to be compensated for the under-delivery via "make goods" ad spots. | Feldstein Decl. ¶ 44. |
| 132. Each Adlink partner was responsible for a *pro rata* share of this deferred revenue "liability." | Feldstein Decl. ¶ 44. |
| 133. While Feldstein still was at Comcast, Adlink's Board of Directors appointed him and Nance to be members of the audit committee. Feldstein and | Feldstein Decl. ¶ 45. |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                    34

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| Nance were asked to create a plan to address this deferred revenue reserve so that, eventually, it could be cleared from Adlink's books. | |
| 134.   Feldstein and Nance created a multi-step plan to address the Adlink's deferred revenue reserve.  They also informed Adlink's Board that the entire liability eventually would "time out" (*i.e.*, barred by the statute of limitations) and that it was unlikely that any advertisers would pursue Adlink for the under-delivery of ratings points. | Feldstein Decl. ¶ 45. |
| 135.   In October 2006, Nance spoke to Feldstein and proposed that, as part of TWC's merger negotiations with Comcast and Adelphia, TWC should seek a payment or adjustment to represent Adelphia's and Comcast's shares of the deferred revenue liability on Adlink's books. | Feldstein Decl. ¶ 46. |
| 136.   Based on Feldstein's work with Nance on Adlink's audit committee, Feldstein did not believe that the deferred revenue reserve was "real," *i.e.*, that Adlink or any of its partners ever would have to pay any advertiser to | Feldstein Decl. ¶ 47. |

Morgan, Lewis & Bockius LLP
Attorneys At Law
Los Angeles

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| compensate for the under-delivery of ratings points.   Feldstein believed that the liability would just "time out." | |
| 137.   Feldstein thought that Nance's proposal to seek payment from Comcast and Adelphia to compensate TWC for money that TWC never would pay in connection with Adlink's deferred revenue reserve lacked integrity and could harm negotiations. | Feldstein Decl. ¶ 47. |
| 138.   On October 24, 2006, Nance emailed Feldstein and others a chart that reflected the amount of deferred revenue on Adlink's books for 2004 - 2006 and the percentage share for which each Adlink partner was responsible. | Feldstein Decl. ¶ 73, Exh. 12 |
| 139.   In response to Nance's October 24th email, on October 25, Feldstein emailed Nance saying, "Let's be careful[.] Comcast will take the position that the reserve is not valid given what I communicated [while] I was there." | Feldstein Decl. ¶ 73, Exh. 12 |
| 140.   Nance responded to Feldstein by email saying, "I hear you, it was always Time Warner's position that this was a valid liability in that it was based on the audited GAAP financial statements.  I | Feldstein Decl. ¶ 73, Exh. 12 |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| recognize it is a tough position for you now that you are sitting in the TWC chair.  I am sure it will be a negotiation at the end of the day…." | |
| 141.   Nance believed that an accounting entry should have been made as part of the true-up process of the Comcast acquisition to reflect Comcast's share of the deferred revenue liability, which would affect the purchase price.  Failing to pursue the issue meant that TWC would be out about $2 million that it could possibly have recovered from Comcast. | Nance Depo. at 180:14-25 to 181:103; *id.* at 182:22-25 to 183:1-7 |
| 142.   A decision whether or not to pursue cash or other remedy from Comcast or Adelphia in the true-up stage was a business decision that was not involve accounting or GAAP-related issues. | Feldstein Decl. ¶ 47. |
| 143.   The issue raised in exception 22.ix first arose in June 2007 when TWC discovered that, although only Adlink was required to create a deferred revenue reserve related to its account executive's misrepresentation of ratings points, Adelphia actually had itself | Feldstein Decl. ¶ 48. |

Morgan, Lewis & Bockius LLP
Attorneys At Law
Los Angeles

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| booked $ 2.1 million of deferred revenue. | |
| 144.   TWC also discovered that Adlink (although not required to do so) had run a large number of free "make good" ads for advertisers that had been affected by the under-delivery of ratings points. | Feldstein Decl. ¶ 48. |
| 145.   In consultation with Bill Osbourn and others, Feldstein made the judgment that the value of those free spots could be recognized as revenue and the deferred revenue reserve could thereby be reduced. | Feldstein Decl. ¶ 48. |
| 146.   The value of the free spots that Adlink had run was determined to be at least $2.1 million.   Therefore, Feldstein decided to recognize $2.1 million in revenue and clear the $2.1 million deferred revenue reserve that had been on Adelphia's books. | Feldstein Decl ¶ 49; ¶ 74, Exh. 13 (AN16-17) <br> Nance Dep. 322:9-15 |
| 147.   Nance was copied to the emails relating to this issue and asked whether the $2.1 million should be booked by TWC corporate rather than the West ROC.  Nance requested affidavits from Adlink reflecting that it had, in fact, run free spots valued at least $2.1 million | Nance Dep. 322:9-15 <br> Feldstein Decl. ¶ 74, Exh. 13 (AN16-17) <br> Nance Depo. at 190:24-25 to 192:8 (in June/July 2007, Nance asked Feldstein to record $2.1 million in revenue recognition at corporate level |

| | |
|---|---|
| | rather than locally because Nance did not have the supporting documentation) |
| 148.   In an email dated June 21, 2007, Adlink sent Nance the "affidavits related to the Make-Up weight," which reflected that Adlink had run nearly 6,000 free spots during August 2006 – March 2007. Based on those affidavits, TWC calculated the value of the free spots to be $2,974,000.  Feldstein forwarded this calculation to Nance and Osbourn, and Nance responded, "Excellent, thanks." | Feldstein Decl. ¶ 77, Exh. 16 (TWC Nance 659-660) |
| 149.   In an email dated June 22, 2007, Feldstein asked Nance, "feel better?" Nance responded: "Definitely, thanks." | Feldstein Decl. ¶ 77, Exh. 16 (TWC Nance 659-660) |
| 150.   Nance did not mention this issue relating to the $2.1 million in deferred revenue in the regional rep letter for the third quarter of 2007. | Feldstein Decl. ¶ 50. |
| **Exception 22.v: Cable Division's Booking of Barter Transactions** | |
| 151.   Exception 22.v reads as follows: "We represent that for all non-marketing orders [i.e., orders from the Media Sales Division, not the marketing department of the Cable Division] have been entered at fair market value. However, we have | Feldstein Decl. ¶ 68, Exh. 7. |

| | |
|---|---|
| been made aware that from time to time the marketing department staff in the corporate office and the [Cable Division] enter transactions which in fact are trade arrangements with outside third parties.  Since we do not account for marketing orders we can represent that these transactions are being recorded at fair value." | |
| 152.   A "trade arrangement" is also called a "barter transaction," which is a non-cash exchange of goods and services, such as the exchange of TWC advertising time for baseball tickets. | Nance Depo. at 193:20 to 194:1. Feldstein Decl. ¶ 51. |
| 153.   Organizationally, the Cable Division is distinct from the Media Sales Division and has its own finance team. Nance's team had no authority over or responsibility for the Cable Division's accounting. | Feldstein Decl. ¶ 52. |
| 154.   Nance's concern was that the Cable Division might be engaging in barter transactions but not reflecting those transactions on its books. | Nance Depo. at 194:2-21 |
| 155.   Nance admits that Feldstein's only connection to the barter transaction issue was that "he [was] an officer of the | Nance Depo. at 199:18-22; 200:23 to 201:6. |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3                                           40

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| company." | |
| 156.   In emails dated January 9-10, 2007 to Feldstein, Osbourn, and others, Nance had previously raised questions about the accounting for barter transactions in the Cable Division vs. the Media Sales Division. | Nance Depo at 283:22-284:10, Feldstein Decl. ¶ 75, Exh. 14 (AN95-96) |
| 157.   The value of annual barter transactions is so low, that, no matter how they're recorded, they could never materially impact the accuracy of TWC's financial statements. | Osbourn Depo. at 74:19 to 76:10. Feldstein ¶ 53. |
| 158.   In fact, because the revenue is booked equal to the expense in barter transactions, they have no bottom-line impact on TWC's profit/loss statement. | Feldstein Decl. ¶ 53. Nance Depo at 283:22-284:10; Feldstein Decl. ¶ 75, Exh. 14 (AN95-96) (Michael Stravino in technical accounting advises Nance that, "Barter transactions should be recorded," but "[t]here is generally no net impact to our p & l [profits & loss statement] since the two sides of the transaction are assigned the same value."). |
| **Exception 22.viii: Lack Of Written Contracts For Six Clients** | |
| 159.   Exception 22.viii reads as follows: "Pursuant to paragraph 2.b we are disclosing that during the 4th quarter, we | Feldstein Decl. ¶ 67, Exh. 6 (TWC-NANCE 676-679) |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| obtained knowledge that the ROC traffic department was running six PI [Per Inquiry] clients without contracts and without going thru the SOX approved order entry process." | |
| 160.   The referenced "paragraph 2.b" states that the signatories have disclosed all deficiencies in the design or operation of internal control over financial reporting. | Feldstein Decl. ¶ 67, Exh. 6 (TWC-NANCE 676-679) |
| 161.   After the Adelphia/Comcast merger with TWC, TWC found a handful of Adelphia/Comcast legacy client for which there were no written contracts relating to the running of advertising in "filler" spots. | Nance Depo. 328:3-13; Feldstein Decl. ¶ 76, Exh. 15 (AN40-42) |
| 162.   Nance was included in emails between the finance and traffic departments exchanged on July 19, 2007 and July 24, 2007 that identified the six clients that did not have written contracts, explained why that was so, and attached a chart that provided the value of the ads that had been run for these clients. | Nance Depo. 328:3-13; Feldstein Decl. ¶ 76, Exh. 15 (AN40-42) |
| 163.   In an email dated July 24, 2007, the Traffic Operations Manager stated | Nance Depo. 328:3-12; Feldstein Decl. ¶ 76, Exh. 15 (AN40- |

| | |
|---|---|
| that all filler spots for the six identified clients with no written contracts would end that same day. | 42) |
| 164.   The existence of a written contract for running ads or evidence of the parties' past practice are necessary to determine *when* revenue is recognized (either when the obligation is incurred or when the cash is received). | Osbourn Depo. at 70:24-72:7 |
| 165.   The value of these arrangements generally was only several thousand dollars per month and, therefore, the related accounting entries would have absolutely no impact on the accuracy of TWC's financial statements | Nance Depo. 328:3-12<br>Feldstein Decl. ¶ 76, Exh. 15 (AN40-42) |
| 166.   In Nance's response to DeGroff's email inquiring about the materiality of exception 22.viii, Nance did not even provide a monetary figure.  Rather, he said that the exception identified an internal control deficiency because the Traffic Department failed to use the approved order entry system for these six clients. | Feldstein Decl. ¶ 70, Exh. 9 |
| 167.   Nance had no reason to believe that Feldstein disapproved of Nance reporting this exception. | Nance Depo. at 204:6-24. |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| **Feldstein Notifies Nance Of His Termination** | |
|---|---|
| 168.   By February 2008, Feldstein was spending more time in Los Angeles and was able to focus more on his new role in the West ROC.  He wanted to transition Nance out before the end of February so that the Charter deal would not be disrupted by the transition. | Feldstein Decl. ¶ 55. |
| 169.   On February 17, 2009, Ken Cole from Human Resources and Feldstein met with Nance and informed him of his termination. | Nance Depo. at 227:5-15. |
| 170.   As part of this termination, Nance was offered a generous severance package, which he refused. | Nance Depo. at 228:20-22. |
| 171.   Over the next several months, TWC eliminated other director-level positions in the Western Region as well, including the Controller at Adlink (Michele Hagopian) and the Chief Financial Officer (Chris Benigo). | Feldstein Decl. ¶ 56. <br> Nance Depo. at 312:5-12 |
| 172.   Bill Osbourn's responsibilities include Sarbanes Oxley compliance for TWC.  At the time that he learned of Nance's termination in February 2008, he knew about the rep letter exceptions submitted by Nance, which could be | Osbourn Depo. 6:25 to 10:3 |

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS

| | |
|---|---|
| interpreted as identifying "deficiencies" under Sarbanes Oxley's tiered framework for categorizing control deficiencies. | |
| 173.  "Deficiencies" under Sarbanes Oxley (as opposed to "significant deficiencies" and "material weaknesses") are fairly common and would have a de minimis impact on financial statements.  They need not be reported to the company's outside auditor or to the public. | Osbourn Depo. at 6:25 to 10:3 |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

| | |
|---|---|
| 174.   Neither Osbourn nor Feldstein had any concern that Nance's termination would violate the Sarbanes Oxley Act. | Osbourn Depo. at 39:19-23<br>Feldstein Decl., ¶ 60 |
| 175.   Nance never raised any Tax Code issues to Feldstein or others.  Rather, he testified only that the exceptions he listed in the rep letter had tax implications. | Nance Depo. at 206:2-9; Feldstein Decl. 58; Compl. 36-43 (alleging that Cable Division's failure to report barter transactions could have tax implications). |

No objections having been filed the Court finds that the facts herein are supported by the evidence.

Summary judgment is entered in favor of Defendant in accordance herewith.

Dated:  November 4, 2009

_____
The Honorable Manuel Real
United States District Judge


Respectfully Submitted by:
MORGAN, LEWIS & BOCKIUS LLP

By:   _____/s/_____
        Jason S. Mills
        Attorneys for Defendant
        Time Warner Cable, Inc.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/21388295.3

46

[PROPOSED] FINDINGS OF UNCONTROVERTED FACTS